GREGORY C. LOARIE (CA Bar No. 215859)
gloarie@earthjustice.org
TAMARA T. ZAKIM (CA Bar No. 288912)
tzakim@earthjustice.org
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
Tel: (415) 217-2000
Fax: (415) 217-2040

*Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, and ENVIRONMENTAL PROTECTION INFORMATION CENTER,<br><br>            Plaintiffs,<br><br>    vs.<br><br>U.S. FISH & WILDLIFE SERVICE; SALLY JEWELL, in her capacity as Secretary of the Interior; and DANIEL M. ASHE, in his capacity as Director of U.S. Fish & Wildlife Service,<br><br>            Defendants. | Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.     According to the U.S. Fish & Wildlife Service (the "Service"), the "coastal marten" is a discrete and biologically significant population of Pacific marten (*Martes caurina*) that was once widespread throughout coastal Oregon and northern California.  According to the Service, coastal martens are today gone from more than 83 percent of their historic range, victim to decades of rampant logging, fur trapping, and other ills.  The few coastal martens still surviving must contend with ever-shrinking forests, prey laced with poisons from illicit marijuana cultivation, genetic isolation, road kill and more.  Sadly, coastal martens are on the brink of extinction.

2.     Despite these indisputable facts and contrary to a comprehensive assessment performed by its own staff scientists, the Service concluded on April 7, 2015, that coastal martens do not warrant listing as a threatened or endangered species under the Endangered Species Act ("ESA").  *See* 80 Fed. Reg. 18,742 (Apr. 7, 2015).  The Service's "not warranted" finding means that coastal martens will not receive any federal protection under the ESA.

3.     This case challenges the Service's inexplicable "not warranted" finding and refusal to afford coastal martens the protection they so urgently need.  As set forth below, the Service's finding is arbitrary, capricious and contrary to the best scientific and commercial data available, in violation of the ESA.  The Service's finding also relies improperly on a listing "policy" adopted by the Service in 2014 that is itself illegal, because it is inconsistent with the plain language of the ESA.

4.     So that coastal martens might survive and recover, plaintiffs ask this Court to set aside the Service's finding that coastal martens do not warrant protection under the ESA, declare that the Service's 2014 listing policy is illegal as set forth below and enjoin the Service from relying on those aspects of the policy going forward, and remand the matter so that the Service can reconsider listing the coastal marten as threatened or endangered in accordance with the ESA.

**JURISDICTION AND VENUE**

5.     The Court has jurisdiction over this action by virtue of 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), 16 U.S.C. § 1540(c) (actions arising under the ESA), and 16 U.S.C. § 1540(g) (citizen suit provision of the ESA).

6.      As required by the ESA, 16 U.S.C. § 1540(g), plaintiffs provided sixty days' notice of the violations alleged herein on September 1, 2015.  A copy of plaintiffs' notice letter is attached hereto as Exhibit A.

7.      Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(e) and 16 U.S.C. § 1540(g)(3)(A), because plaintiff Environmental Protection Information Center is incorporated in this District, coastal martens inhabit Del Norte and Humboldt counties, and all or part of the violations alleged herein occurred in this district.

8.      Assignment to the San Francisco Division of this Court is proper, because a substantial part of the events and omissions giving rise to the claims herein occurred in counties assigned to the San Francisco Division.

## PARTIES

9.      Plaintiff Center for Biological Diversity (the "Center") is a non-profit organization with offices in Oakland, Sacramento, Joshua Tree, Los Angeles, Shelter Cove, and San Diego, California, as well as a number of other states.  The Center has over 50,000 members throughout the United States and the world.  The Center works through science, law, and policy to secure a future for all species hovering on the brink of extinction.  The Center is actively involved in species and habitat protection in northern California.

10.     Plaintiff Environmental Information Protection Center ("EPIC") is a non-profit public benefit corporation with approximately 3,000 members organized under the laws of the State of California with its main office in Arcata, just miles from California's last remaining population of coastal martens.  EPIC's purpose is to protect and restore the biological diversity and ecosystem health of California's rivers and forests.  To this end, EPIC monitors state and federal environmental management activities to ensure compliance with current law and works to protect and restore ancient forests, watersheds, coastal estuaries, and native species throughout Northwestern California, including both public and industrial forestlands.  EPIC also serves as a community resource center for members of the public working to protect forest ecosystems.

11.     Plaintiffs' members and staff live, work, and/or recreate throughout the current and historic range of the coastal marten.  Plaintiffs use and enjoy, on a continuing and ongoing basis, the

habitat of the coastal marten and the larger ecosystem upon which it depends.  Plaintiffs' members and staff derive aesthetic, recreational, scientific, inspirational, educational, and other benefits from the coastal marten's existence in the wild, on a regular and continuing basis, and they intend to do so frequently in the future.  Plaintiffs' members and staff have participated in efforts to protect and preserve the habitat essential to the continued survival of the coastal marten.  Among other actions, plaintiffs petitioned the Service to protect the coastal marten under the ESA in September 2010.  Plaintiffs bring this action on their own institutional behalf and on behalf of their adversely affected members and staff.

12.     The aesthetic, recreational, scientific, inspirational, educational, and other interests of plaintiffs in the coastal marten have been, are being, and, unless the relief requested herein is granted, will continue to be adversely and irreparably injured by the Service's refusal to list the coastal marten as an endangered or threatened species and to designate critical habitat for the species under the ESA.  These are actual, concrete injuries to plaintiffs, caused by the Service's failure to comply with the ESA and its implementing regulations and policies.  These injuries would be redressed by the relief requested in this complaint.  Plaintiffs have exhausted all available administrative remedies and have no other adequate remedy at law.

13.     Defendant U.S. Fish and Wildlife Service is an administrative agency within the U.S. Department of Interior responsible for implementing the ESA with respect to terrestrial mammals such as the coastal marten.

14.     Defendant Sally Jewell is the Secretary of the Department of Interior.   The Secretary of the Interior is the federal official vested with responsibility for properly carrying out the ESA with respect to terrestrial mammals such as the marten. She is sued in her official capacity.

15.     Defendant Daniel M. Ashe is the Director of the U.S. Fish & Wildlife Service.  He is sued in his official capacity.

## FACTUAL BACKGROUND

16.     Martens are long, slender carnivores closely related to minks, otters, and fishers, with fox-like faces and large triangular ears.  A quintessential "old forest" species, martens inhabit mature forests "composed of long-lived, large trees, with multi-layered canopy structure, substantial large

woody debris (standing and downed), and abundant ferns, herbs, and shrubs on the forest floor." 80 Fed. Reg. at 18,747.

17.     Historically, martens were relatively widespread throughout the wet coastal forests that once extended from Sonoma County, California, north through Oregon to the Columbia River. Indeed, at the time of European settlement, martens "occurred in all coastal Oregon counties and the coastal northern counties of California within late-successional coniferous forests." *Id.* at 18,749. These coastal martens are genetically different from other marten populations, due to their geographic isolation from their cousins in the Sierra Nevada and Cascade Mountains to the east. *Id.* at 18,745.

18.     The coastal forests of Oregon and northern California are some of the most intensely logged forests in the country.  As a result of decades of logging, "much of the coastal marten's historical habitat has been lost." *Id.* at 18,749.  According to the Service, "less than 5 percent of the redwood forests existing at the time of European settlement remain within the historical range of the coastal marten in coastal northern California." *Id.* at 18,749-50.  Much of the remaining coastal forest habitat in both Oregon and California is owned "by either private industrial timber companies or smaller land owners, and managed for timber production." *Id.* at 18,750.

19.     In addition to logging, "[u]nregulated fur trapping occurred throughout the coastal marten's historical range, and by the late 1920s, few marten were captured where they were once considered relatively abundant." *Id.* at 18,749.  According to the Service, "[h]istorical fur trapping is thought to have resulted in a significant contraction of coastal marten distribution and the extirpation of coastal marten from large portions of its historical range." *Id.*

20.     Extensive habitat loss, trapping, and other human-induced stressors have taken a heavy toll on coastal martens.  According to the Service, the "best available scientific and commercial data" indicates that today only three populations of martens still remain in coastal Oregon and northern California. *Id.* at 18,750.  Collectively, these three "extant" (*i.e.*, surviving) populations inhabit less than 17 percent of the marten's historic range in coastal Oregon and northern California.  The location of the marten's three surviving populations is depicted in Figure 1 of the Service's "not warranted" finding, reproduced below.

Figure 1— Analysis area showing historical range and extant population areas for coastal Oregon and northern coastal California populations of the Pacific marten (*Martes caurina*)

80 Fed. Reg. at 18,751.

21.     According to the Service, the last remaining population of coastal martens in northern California is extremely small, likely consisting of less than 100 individuals.  Martens are so rare in northern California that scientists for years believed the species had been rendered extinct.  The discovery of a marten in coastal northern California in 1996 represented the first verified presence of the species in California in 50 years.

**STATUTORY BACKGROUND**

22.     The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180 (1978). The statute contains an array of strict procedural and substantive safeguards to prevent activities that would jeopardize the continued existence of threatened and endangered species, result in the destruction or adverse modification of their critical habitat, or harm individual members of such species. *See, e.g.*, 16 U.S.C. §§ 1536, 1538.  The statute also requires the federal government to develop plans to facilitate the recovery of threatened and endangered species. *Id.* § 1533(f).

23.     Before a species receives the protections of the ESA, it must first be officially "listed" as either "threatened" or "endangered." *Id*. § 1533.  A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6).  Alternatively, a species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

24.     Under Section 4 of the ESA, the Secretary of Interior, acting through the Service, is responsible for determining whether any terrestrial "species" warrants listing as threatened or endangered. *Id.* § 1533(a)(1).  The term "species" is defined broadly by the statute to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id*. § 1532(16).

25.     The ESA does not expressly define the term "distinct population segment" (or "DPS").  However, the Service adopted a policy in 1996 to guide its evaluation of whether a particular wildlife population qualifies as a DPS.  *See* 61 Fed. Reg. 4,722 (Feb. 7, 1996).  In short, the Service's DPS policy directs the agency to analyze the "[d]iscreteness of the population segment in relation to the remainder of the species to which it belongs" and the "significance of the population segment to the species to which it belongs." *Id*. at 4,725.

26.     The ESA directs the Service to "determine whether any species is an endangered species or a threatened species because of any of the following factors:"

> (A)   the present or threatened destruction, modification, or curtailment of its habitat or range;

(B)    overutilization for commercial, recreational, scientific, or educational purposes;

(C)    disease or predation;

(D)    the inadequacy of existing regulatory mechanisms; or

(E)    other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1).  These factors are listed in the disjunctive; any one or a combination can be sufficient for a finding that a particular species is endangered or threatened.

27.    The ESA requires the Service to make its listing determinations "solely on the basis of the best scientific and commercial data available."  *Id.* § 1533(b)(1)(A).  Consistent with the Act's language and purpose, courts have confirmed that the "best available data" standard requires the Service "to consider the scientific information presently available and intended to give the benefit of the doubt to the species."  *Brower v. Evans*, 257 F.3d 1058, 1070 (9th Cir. 2001)

## PROCEDURAL BACKGROUND

28.    On September 28, 2010, plaintiffs petitioned the Service to list the martens that still inhabit the coastal forests of northern California and Oregon as "threatened" or "endangered" under the ESA.  Due to ongoing scientific uncertainty regarding their precise taxonomy, plaintiffs' petition referred to these coastal martens as the subspecies *Martes americana humboldtensis*, the subspecies *Martes caurina humboldtensis*, or, in the alternative, as a distinct population segment ("DPS") of the species *Martes caurina.*  Plaintiffs' petition summarized, cited, and attached substantial scientific information demonstrating that martens in coastal Oregon and northern California are at serious risk of extinction and warrant immediate protection under the ESA.

29.    On January 12, 2012, the Service announced its "initial finding" under Section 4(b)(3)(A) of the ESA, 16 U.S.C. § 1540(b)(3)(A), that plaintiffs' listing petition presented substantial information indicating that the coastal Oregon and northern California population of martens may warrant listing as a threatened or endangered species under the ESA.  77 Fed. Reg. 1,900 (Jan. 12, 2012).  In light of this initial finding, the Service began a comprehensive review of the coastal marten's taxonomy and status.

30.    Service biologists completed their scientific review of the coastal marten in early 2015, and they documented their findings in a "Species Report" dated April 2015.  According to the

Service, "[t]he purpose of the Species Report is to provide the best available scientific and commercial information about the species so that we can evaluate whether or not the species warrants protection under the [ESA]." 80 Fed. Reg. at 18,743.

31.     Based on the best scientific and commercial data available, the Service's Species Report confirms that there are only two small populations of martens remaining on the Oregon coast, and just one tiny population, likely consisting of fewer than 100 individuals, on the north coast of California. The Species Report confirms that these three remaining populations occupy collectively less than 17 percent of the marten's historic range in coastal Oregon and northern California. Based on the best scientific and commercial data available, the Species Report concludes that all three of the remaining marten populations are likely declining in number. In addition, the Species Report concludes that the three populations are likely functionally isolated from one another, limiting the opportunity for genetic exchange between populations.

32.     The Service's Species Report documents substantial threats to the survival and recovery of martens in coastal Oregon and northern California, including ongoing logging and trapping, collision with vehicles, secondary exposure to rodenticides, fire, climate change, and development. The Service's Species Report also demonstrates that coastal martens are at risk of extinction, throughout all or at least a significant portion their range, purely by virtue of past human activities like logging and trapping.

33.     On April 7, 2015, without further scientific review, the Service published its final finding under Section 4(b)(3)(B) of the ESA, 16 U.S.C. § 1540(b)(3)(B), as to whether the martens of coastal Oregon and northern California warrant listing under the ESA. 80 Fed. Reg. at 18,742-72.

34.     With respect to taxonomy, the Service's final finding concludes that the martens of coastal Oregon and northern California are members of the species *Martes caurina*—the Pacific marten. *Id*. at 18,744. The Service's finding further concludes that this coastal population of Pacific martens is "distinct," because it is geographically isolated from and genetically different than Pacific marten populations that inhabit other regions in North America. *Id*. at 18,745. Finally, the Service's finding concludes that the coastal population of Pacific martens is "significant," because the loss of the coastal population "would result in a reduction in Pacific marten genetic diversity" and "would

result in a significant gap in the range for the Pacific marten." *Id.* at 18,746.  Applying the criteria set forth in the Service's 1996 policy for designating a distinct population segment, the Service's final finding therefore concludes that the martens of coastal Oregon and northern California qualify as a distinct population segment of the Pacific marten and are eligible for protection under the ESA as such.  *Id.* at 18,744 (citing 61 Fed. Reg. 4,722 (Feb. 7, 1996)).

35.     Having resolved that coastal martens are eligible for protection under the ESA, the Service's final finding concludes inexplicably that coastal martens are not at risk of extinction throughout all or a significant portion of their range, either now or in the foreseeable future.  *Id.* at 18,772.  The Service's final finding therefore asserts that listing coastal martens as a threatened or endangered under the ESA is "not warranted."  *Id.*

36.     In reaching the determination that coastal martens are not threatened or endangered throughout a significant portion of their range, the Service relied on a policy it adopted in 2014 that purports to interpret the phrase "significant portion of its range" for purposes of listing decision under the ESA.  *See id.* at 18,769 (citing 79 Fed. Reg. 37,578 (July 1, 2014)).

37.     As set forth below, this lawsuit challenges the Service's "not warranted" finding, on the grounds that it is arbitrary, capricious, unsupported by the record, contrary to the best scientific and commercial data available, and based on an illegal listing policy that conflicts with the plain language of the ESA.

**FIRST CAUSE OF ACTION**

(Illegal finding that the coastal marten is not
threatened or endangered throughout all of its range)

38.     Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

39.     Section 4(a)(1) of the ESA requires the Service to determine whether any species is endangered or threatened based on any combination of five enumerated factors.  16 U.S.C. § 1533(a)(1).  The Service must make its determination under Section 4(a)(1) "solely on the basis of the best scientific and commercial data available."  *Id.* § 1533(b)(1)(A).

40.     The Service's conclusion that the coastal marten is not threatened or endangered throughout all of its range is arbitrary, capricious, unsupported by the record, and contrary to the best scientific and commercial data available, in violation of the ESA.

41.     The Service's not warranted finding is based on a number of claims regarding the coastal marten's status that are directly contrary to the best available science, as set forth in the record and the Service's own Species Report.  For example, whereas the Service's Species Report concludes that the three extant coastal populations are "functionally isolated from one another," the Service's finding incorrectly asserts that, "we do not have evidence to suggest that the populations are likely entirely isolated from one another," *see* 80 Fed. Reg. at 18,764.  Along the same lines, whereas the Species Report documents that all three of the extant populations are "presumed to be in decline," the Service's ultimate finding states without support that "there is no empirical evidence that any current populations . . . are in decline," *see id.* at 18,764.  In these and other important respects, the Service's not warranted finding is arbitrary, capricious, and inconsistent with the best available information in the record, in violation of the ESA.

42.     There are numerous other instances in which the Service's not warranted finding relies on claims that are unsupported by, or directly contrary to, the best scientific evidence in the record.  Furthermore, far from giving the benefit of scientific doubt to the species, as the ESA requires, at numerous junctures the Service's not warranted finding improperly characterizes the best scientific evidence regarding the marten's status as "uncertain," and then improperly relies on the purported uncertainty as a basis for concluding that listing is not warranted.  The Service's approach is directly contrary to the ESA.  *See Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 879 (9th Cir. 2009); *Brower*, 257 F.3d at 1070.

### SECOND CAUSE OF ACTION

(Illegal finding that the coastal marten is not threatened
or endangered throughout a significant portion of its range)

43.     Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

44.    The ESA defines an "endangered" species as one that is "in danger of extinction throughout all *or a significant portion* of its range." 16 U.S.C. § 1532(6) (emphasis added). Similarly, a "threatened" species is defined as a species that is "likely to become an endangered species within the foreseeable future throughout all *or a significant portion* of its range." *Id.* § 1532(20) (emphasis added).  Consistent with the plain language of these definitions, courts have made clear that the determination of whether a species is threatened or endangered "throughout a significant portion of its range" cannot be conflated with the question of whether it is threatened or endangered throughout its entire range.  *See, e.g., Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001).

45.    On July 1, 2014, the Service published a final policy that purports to interpret the phrase "significant portion of its range" for purposes of ESA listing decisions.  *See* 79 Fed. Reg. 37,578 (July 1, 2014) (the "SPR policy").  The Service's SPR policy is contrary to the plain language of the ESA, and therefore *ultra vires* the statute, in at least two respects that are relevant to the Service's not warranted finding for the coastal marten.

46.    First, the Service's SPR policy misinterprets "the term 'range' to be the general geographical area within which the species is *currently* found." *Id.* at 37,583 (emphasis added).  The SPR policy further defines "the 'current' range of the species to be the range occupied by the species *at the time the Services make a [listing] determination*." *Id.* (emphasis added.)  However, the plain language of the ESA does not allow the Service to focus myopically on a species' currently occupied habitat.  Rather, courts have held that if a species' current range represents only a fraction of its historic range, the plain language of the ESA requires the Service to "at least explain [the] conclusion that the area in which the species can no longer live is not a 'significant portion of its range.'" *Defenders of Wildlife*, 258 F.3d at 1145.

47.    Second, the Service's SPR policy incorrectly provides that "[i]f the threats to the species are affecting it uniformly throughout its range, no portion is likely to warrant further consideration." 79 Fed. Reg. at 37,586.  However, in determining whether a species is threatened or endangered throughout a significant portion of its range, the plain language of the ESA requires the Service to consider whether the species is "in danger of extinction," either now or in the foreseeable

future.  16 U.S.C. § 1532(6), (20).  Consistent with the plain language of the ESA, a species may well be at "risk on extinction" throughout a significant portion of its range, regardless of whether the threats to the species are relatively uniform throughout its range.

48.     The Service's determination in this case that the coastal marten is not threatened or endangered throughout any significant portion of its range is arbitrary, capricious, unsupported by the record, and contrary to the best scientific data available, in violation of the ESA.

49.     Moreover, in reaching its determination that the coastal marten is not threatened or endangered throughout a significant portion of its range, the Service improperly relied on its SPR policy and the flawed interpretations of the ESA described above.  *See* 80 Fed. Reg. at 18,769 (citing 79 Fed. Reg. 37,578).  For example, relying on its SPR policy, the Service improperly excluded the marten's historic but currently unoccupied habitat from its significant portion of range analysis.  *See id.* at 18,770 ("[T]he range of a species is considered to be the general geographical area within which that species can be found at the time the Service . . . makes [its listing decision].").  Similarly, relying on the SPR policy, the Service terminated prematurely its significant portion of range analysis on the grounds that "the stressors that have the potential to impact coastal martens are relatively consistent across its range."  *Id*. at 18,771.

50.     Because it is contrary to the plain language of the ESA, Service's SPR policy does not provide a legal basis for its not warranted finding for the coastal marten.  The Service's reliance on the SPR policy was arbitrary, capricious, and contrary to the plain language of the ESA.

**REQUEST FOR RELIEF**

WHEREFORE, plaintiffs respectfully request that the Court:

A.     Find and declare that the Service's not warranted finding for the coastal marten is arbitrary, capricious, contrary to the best scientific and commercial data available, and otherwise not in accordance with the EPA;

B.     Find and declare that the Service's SPR policy conflicts with the plain language of the ESA as set forth above, and enjoin the Service from relying on those portions of the SPR policy;

C.     Set aside the Service's not warranted finding for the coastal marten and remand the matter to the Service with instructions to reconsider whether the coastal marten warrants listing in

accordance with the ESA;

      D.     Award plaintiffs their costs of litigation, including reasonable attorneys' fees and costs; and

      E.     Grant plaintiffs such other and further relief as this Court may deem just and proper.

Respectfully submitted,

Dated:  December 16, 2015

  /s/ Gregory C. Loarie
GREGORY C. LOARIE (CA Bar No. 215859)
gloarie@earthjustice.org
TAMARA T. ZAKIM (CA Bar No. 288912)
tzakim@earthjustice.org
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
Tel: (415) 217-2000
Fax: (415) 217-2040

*Counsel for Plaintiffs*

Complaint for Declaratory & Injunctive Relief

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit A**

Complaint for Declaratory & Injunctive Relief



EARTHJUSTICE

ALASKA   CALIFORNIA   FLORIDA   MID-PACIFIC   NORTHEAST   NORTHERN ROCKIES
NORTHWEST   ROCKY MOUNTAIN   WASHINGTON, DC   INTERNATIONAL

September 1, 2015


*Via Certified U.S. Mail*

Sally Jewell, Secretary
U.S. Department of the Interior
1849 C Street, N.W.
Washington, DC 20240

Daniel M. Ashe, Director
U.S. Fish & Wildlife Service
1849 C Street, NW
Washington, DC 20240


> **Re:** **Notice of Intent to Sue for Violations of the Endangered Species Act Regarding "Not Warranted" Listing Decision for the Coastal Oregon and Northern Coastal California Population of Pacific Marten (*Martes caurina*)**

Dear Secretary Jewell and Director Ashe:

On behalf of the Center for Biological Diversity ("the Center") and Environmental Protection Information Center ("EPIC"), we hereby provide notice that the U.S. Fish and Wildlife Service ("Service") is in violation of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500-706, with regard to its determination that the coastal Oregon and northern coastal California population of Pacific marten (*Martes caurina)* does not warrant protection under the ESA.  80 Fed. Reg. 18,742-72 (April 7, 2015).  The Center and EPIC also give notice that the Service's "Final Policy on Interpretation of the Phrase Significant Portion of Its Range" ("SPOR Policy"), 79 Fed. Reg. 37,578 (July 1, 2014), as applied to the "not-warranted" finding for the Pacific marten's coastal population, is inconsistent with the ESA and therefore illegal.  This letter is provided pursuant to the sixty-day notice requirements of the citizen suit provision of the ESA, to the extent such notice is deemed necessary by a court.  16 U.S.C. § 1540(g)(2).

## I.      The Marten and the Listing Petition

Closely related to minks and fishers, martens are long, slender carnivores with fox-like faces and large triangular ears.  Historically, martens were relatively common in old forests throughout North America.  However, decades of logging, development, fur-trapping, road kill, secondary exposure to rodenticides, and other stressors have taken a heavy toll, and marten populations have declined precipitously nationwide.

On September 28, 2010, the Center and EPIC petitioned the Service to list the remnant population of martens that still inhabits the coastal forests of northern California and Oregon as

Sally Jewell & Daniel M. Ashe
September 1, 2015
Page 2 of 6

"threatened" or "endangered" under the ESA.  Due to some scientific uncertainty regarding the
appropriate taxonomy of this marten population, the petition referred to the population as the
subspecies *Martes americana humboldtensis*, the subspecies *Martes caurina humboldtensis*, or,
in the alternative, as a distinct population segment ("DPS") of the species *Martes caurina*.
Regardless of precise taxonomy, the Center and EPIC summarized and attached substantial
scientific information demonstrating that martens in coastal Oregon and northern California are
on the brink of extinction and warrant immediate federal protection under the ESA.

## II.     The Service's Initial Finding and Status Review

On January 12, 2012, the Service announced its "initial finding" under Section 4(b)(3)(A)
of the ESA, 16 U.S.C. § 1540(b)(3)(A), that the Center and EPIC's listing petition presented
substantial information indicating that the coastal Oregon and northern California population of
martens may warrant listing under the ESA.  77 Fed. Reg. 1,900 (Jan. 12, 2012).  In light of this
initial finding, the Service began a comprehensive review of the marten's taxonomy and status.

The Service completed its scientific review in April 2015.  Based on the best scientific
and commercial data available, the Service's final "species report" concludes that there are only
two small subpopulations of martens remaining on the Oregon coast, and just one tiny
population, likely consisting of fewer than 100 individuals, on the north coast of California.  The
species report finds that these three remaining subpopulations collectively occupy less than 17
percent of the marten's historic range in coastal Oregon and northern California, and the report
finds that each of the three extant coastal marten populations are likely functionally isolated from
one another.  Based on this and evidence of other threats to the marten's survival, including
ongoing loss of habitat, climate change, secondary exposure to anticoagulant rodenticides, and
trapping, the Service's overall assessment of the martens' continued viability in coastal Oregon
and northern California can best be described as bleak.

## III.    The Service's Not Warranted Decision

On April 7, 2015, without further scientific review, the Service published its official "12-
month" finding under Section 4(b)(3)(B) of the ESA, 16 U.S.C. § 1540(b)(3)(B).  80 Fed. Reg.
18,742 (Apr. 7, 2015).  The 12-month finding determines that the martens inhabiting coastal
Oregon and northern California qualify as a DPS and are therefore eligible for listing under the
ESA.  *Id.* at 18,746.  The 12-month finding further determines that the DPS is absent throughout
the vast majority of its historic range, and that just three small subpopulations remain.  Despite
overwhelming evidence in the administrative record that the DPS is critically imperiled, the 12-
month finding nevertheless concludes that the DPS is not at risk of extinction throughout all of
its range, and will not be so in the foreseeable future.  *Id.* at 18,769.  Applying the Service's
SPOR Policy, the 12-month finding further concludes, contrary to the scientific evidence in the
record, that the DPS is not threatened or endangered throughout even a significant portion of its
range.  *Id*. at 18,771.

Sally Jewell & Daniel M. Ashe
September 1, 2015
Page 3 of 6

## IV.    Legal Background

Under Section 4 of the ESA, the Secretary of Interior, acting through the Service, is tasked with determining whether any terrestrial "species" warrants listing as "threatened" or "endangered."  16 U.S.C. § 1533(a)(1).  The term "species" is defined broadly by the statute to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."[1]  16 U.S.C. § 1532(16).  A species is considered "endangered" if it "is in danger of extinction throughout all or a significant portion of its range" and "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. § 1532(6), (20).

The ESA directs the Service to "determine whether any species is an endangered species or a threatened species because of any of the following factors:"

(A)  the present or threatened destruction, modification, or curtailment of its habitat or range;
(B)  overutilization for commercial, recreational, scientific, or educational purposes;
(C)  disease or predation;
(D)  the inadequacy of existing regulatory mechanisms; or
(E)  other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1).  Notably, "[t]hese factors are listed in the disjunctive; any one or a combination can be sufficient for a finding that a particular species is endangered or threatened." *Federation of Fly Fishers v. Daley*, 131 F. Supp. 2d 1158, at 1164 (N.D. Cal. 2000).  *See also Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1137-38 (9th Cir. 2001) ("If the [Service] decides that . . . one or more of five statutorily defined factors demonstrates that a species is endangered or threatened, [it] must issue a proposed rule recommending that species for ESA protection.").

Section 4 further requires the Service to make its listing determinations "solely on the basis of the best scientific and commercial data available."  16 U.S.C. § 1533(b)(1)(A).  "With [the] best available data standard, Congress required [the] agency to consider the scientific information presently available and intended to give the benefit of the doubt to the species." *Brower v. Evans*, 257 F.3d 1058, 1070 (9th Cir. 2001) (quoting *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988)).  Accordingly, even when a listing decision "is a close call," the Service must "err on the side of the species." *Endangered Species Act Oversight:  Hearing on S. 321 Before the Senate Subcomm. on Envtl. Pollution of the Comm. on Env't & Pub. Works*, 97th Cong. 37 (1981) (remarks of Senator Chafee).  In so doing, the agency gives effect to Congress'

---

[1] The ESA does not expressly define the term "distinct population segment."  However, the Service adopted a policy in 1996 to guide its evaluation of whether a particular wildlife population qualifies as a DPS.  *See* 61 Fed. Reg. 4,722 (Feb. 7, 1996).  In short, the Service's DPS policy directs the agency to analyze the "discreteness of the population segment in relation to the remainder of the species to which it belongs" and the "significance of the population segment to the species to which it belongs."  *Id.* at 4,725.

Sally Jewell & Daniel M. Ashe
September 1, 2015
Page 4 of 6

policy of "institutionalized caution," which "lies at the heart" of the ESA.  *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 178, 194 (1978).

## V.       Violations of Law

As detailed above, listing decisions under the ESA must be made "solely on the basis of the best scientific and commercial data available," giving the benefit of any doubt to the species.  16 U.S.C. § 1533(b)(1)(A).  More generally, in judicial review under the APA, agency actions are to be set aside if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  *See* 5 U.S.C. § 706(2).  It is well settled that an "agency must examine the relevant data and articulate a satisfactory explanation for its action" that does not "run[] counter to the evidence before the agency" and that "include[s] a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

As set forth below, the Service's determination that the coastal DPS of the Pacific marten does not warrant listing as a threatened or endangered species is not based on the best scientific and commercial data available, is arbitrary and capricious, and is otherwise not in accordance with law, in violation of the ESA and APA.

### A.       The Service Violated the ESA and APA When It Failed To List the Coastal DPS of the Pacific Marten as Threatened or Endangered Throughout All of Its Range.

The Service's determination that the coastal DPS of the Pacific marten is not threatened or endangered throughout all of its range is contrary to the best scientific and commercial data available and is arbitrary and capricious.  In reaching its "not warranted" conclusion, the Service's 12-month finding relies on a number of claims that are directly contrary to the best available science, as set forth in the record and the Service's own species report.  For example, while the Service's species report concludes that the three extant coastal populations are "functionally isolated from one another," *see* Species Report at 43, the 12-month finding states inexplicably, "we do not have evidence to suggest that the populations are likely entirely isolated from one another," *see* 80 Fed. Reg. at 18,764.  Along the same lines, whereas the species report concludes that all three of the extant populations are "presumed to be in decline," Species Report at 40, the 12-month finding states without support that "there is no empirical evidence that any current populations . . . are in decline," *see* 80 Fed. Reg. at 18,764.

There are numerous other instances in which the Service's 12-month finding relies on claims that are unsupported by, or directly contrary to, the best scientific evidence in the administrative record, including the denial of threat factors in the 12-month finding that were identified as threat factors in the species report.  Furthermore, far from giving the benefit of any scientific doubt to the species, as the ESA requires, at numerous junctures the Service's 12-month finding improperly characterizes the best scientific evidence regarding the marten's status as "uncertain," and then improperly relies on the purported uncertainty as a basis for concluding

that listing is not warranted.  The Service's approach is directly contrary to the ESA.  *See, e.g., Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 679 (D.D.C. 1997) ("The [ESA] contains no requirement that the evidence be conclusive in order for a species to be listed.").  *See also Ctr. for Biological Diversity v. Lohn*, 296 F. Supp. 2d 1223, 1239 (W.D. Wash. 2003), *vacated as moot*, 483 F.3d 984 (9th Cir. 2007) ("To deny listing of a species simply because one scientific field has not caught up with the knowledge in other fields does not give the benefit of the doubt to the species and fails to meet the best available science requirements.").

In the end, it is apparent that the Service's 12-month finding is not based "solely on the basis of the best scientific and commercial data available," but rather is arbitrary and capricious, in violation of the ESA and APA.

**B.      The Service Unlawfully Concluded That Coastal DPS of the Pacific Marten Is Not Threatened or Endangered Throughout a Significant Portion of Its Range.**

Even if a species is not threatened or endangered across its entire range, it still must be listed under the ESA if it is threatened or endangered throughout a "significant portion of its range."  *See* 16 U.S.C. § 1532(6), (20).  Courts have made clear that the determination of whether a species is threatened or endangered throughout a significant portion of its range cannot be conflated with the question of whether it is threatened or endangered throughout its entire range.  *See, e.g.*, *Defenders of Wildlife*, 258 F.3d at 1145.  Moreover, the agency must consider both current and historical habitat in making this determination.  *Id.; WildEarth Guardians v. Salazar*, 741 F. Supp. 2d 89, 98 (D.D.C. 2010).

The Service's determination that coastal DPS of the Pacific marten is not threatened throughout at least a significant portion of its range is unlawful for several reasons.  First, the Service's determination was based on a flawed interpretation of the ESA that is inconsistent with federal caselaw construing the phrase "significant portion of its range."  *See, e.g., Defenders of Wildlife*, 258 F.3d at 1141.  For example, the Service's 12-month finding improperly and summarily concludes that the Pacific marten's coastal DPS is not threatened or endangered throughout a significant portion of its range on the grounds that the many stressors impacting the species are "relatively consistent across its range."  80 Fed. Reg. at 18,771.  Not only is the Service's determination in this regard contrary to the best scientific and commercial information available, arbitrary, and capricious, but—even if true—the purported "uniformity" of stressors is not a legal or sufficient basis for concluding that a species is not threatened or endangered throughout a significant portion of its range.

Second, the Service wholly failed to consider the substantial loss of historic marten habitat in making its determination as to whether martens are threatened or endangered throughout a significant portion of its range.  *See, e.g., WildEarth Guardians,* 741 F. Supp. 2d at 98 (historical habitat must be considered as part of analysis of whether a species is endangered or threatened in a "significant portion of its range").  The best scientific information available, as described in the Service's own species report, indicates that the coastal DPS is already extinct

Sally Jewell & Daniel M. Ashe
September 1, 2015
Page 6 of 6

throughout *85 percent* of its historic range in coastal Oregon, and over *95 percent* of its historic range in coastal northern California. *See* Species Report at 99, 29. The Service's 12-month finding fails to consider whether the DPS is threatened or endangered throughout at least a significant portion of its range as a result of this substantial loss of historic habitat.

In reaching its determination that the Pacific marten's coastal DPS is not threatened or endangered throughout a significant portion of its range, the Service applied its SPOR Policy. *See* 80 Fed. Reg. 18,769 (citing 79 Fed. Reg. 37,578 (July 1, 2014)). However, the Service's SPOR Policy, as applied to the agency's "not warranted" finding for the Pacific marten's coastal DPS, violates the ESA. The Center and EPIC have detailed previously the numerous ways in which the Service's SPOR Policy is inconsistent with the ESA and caselaw interpreting the phrase "significant portion of the range." *See, e.g.,* Attachment A hereto (March 8, 2012 Comments on Service's Draft SPOR Policy). The Center and EPIC incorporate their prior comments herein. Here, the Service's application of its SPOR Policy to the Pacific marten's coastal DPS resulted in violations of the ESA. For example, the Service improperly excluded the DPS' historic habitat from its analysis. *See* 80 Fed. Reg. 18,770 ("[T]he range of a species is considered to be the general geographical area within which that species can be found at the time the Service . . . makes any particular status determination.") Consistent with the plain language of the ESA, however, federal courts have made clear that the Service "must at least explain [the] conclusion that the area in which the species can no longer live is not a significant portion of its range." *Defenders of Wildlife*, 258 F.3d at 1141.

In short, the Service's conclusion that that the coastal DPS of the Pacific marten is not threatened or endangered throughout at least a significant portion of its range is contrary to the best scientific and commercial data available and is arbitrary and capricious, in violation of the ESA and APA.

## IV.    Conclusion

We intend to pursue legal action in federal court to challenge the Service's "not warranted" listing decision for the coastal Oregon and northern coastal California population of Pacific marten as well as the Service's SPOR Policy, as both violate the ESA and the APA. Should you wish to discuss this matter, or if you believe any of the foregoing is in error, please do not hesitate to contact us.

Sincerely,

Gregory C. Loarie, Staff Attorney
Earthjustice

Encl.  (Attachment A:  March 8, 2012 Comments on Service's Draft SPOR Policy)

Attachment A

March 8, 2012

TO:     Tina Campbell, Chief
        Division of Policy and Directives Management
        U.S. Fish and Wildlife Service
        4401 North Fairfax Drive, MS 2042
        Arlington, VA 22203
        Attn: FWS–R9–ES–2011–0031

RE:     Comments on a draft policy on interpretation of the phrase "significant portion of its
        range" in the Endangered Species Act's definitions of "endangered species" and
        "threatened species."

Dear Ms. Campbell:

On behalf of our millions of members and supporters who care deeply about imperiled wildlife
that depend on the nation's forests, deserts, grasslands, oceans and other ecosystems, we write to
express our concerns with the draft policy on interpretation of the phrase "significant portion of
its range" ("SPOIR") proposed by U.S. Fish and Wildlife Service (FWS) and National Marine
Fisheries Service (NMFS).  The Endangered Species Act defines an endangered species as "any
species which is in danger of extinction throughout all or a significant portion of its range" and a
threatened species as "any species which is likely to become an endangered species within the
foreseeable future throughout all or a significant portion of its range."  The language of these
definitions, the legislative history, recent case law, and the draft policy itself all make clear that
a species need not be at risk of worldwide extinction to qualify for Endangered Species Act
protection.  Rather, as noted in the draft policy, a species can qualify as an endangered species in
two ways: if it is in danger of extinction "throughout all of its range," or if it is in danger of
extinction "in a significant portion of its range."[1]  In enacting this provision, Congress intended
to provide a means to protect species before they are on the brink of extinction, which is of
paramount importance to species conservation.

The previous policy developed by the Solicitor of the Department of the Interior ran afoul of the
ESA's statutory language, and we supported its withdrawal.[2]  We have serious concerns,
however, about provisions of the draft policy—specifically: (1) the proposed definition of
"significant," which specifies that a portion of range can be considered significant only if loss of
the species from that portion would threaten the species as a whole with extinction, and (2) the
determination that lost historic range cannot qualify as a significant portion of range.

The draft policy specifies that a "portion of the range of a species is 'significant' if its
contribution to the viability of the species is so important that without that portion, the species

---

[1] U.S. Fish and Wildlife Service and National Oceanic and Atmospheric Administration.  2011.  Draft Policy on
Interpretation of the Phrase ''Significant Portion of Its Range'' in the Endangered Species Act's Definitions of
"Endangered Species" and "Threatened Species."  December 9, 2012, 76 Fed. Reg. 76,991.
[2] U.S. Department of the Interior, Office of the Solicitor.  2007.  The Meaning of "In Danger of Extinction
Throughout All or a Significant Portion of its Range."  Memorandum M-37013, March 16, 2007.

would be in danger of extinction."[3]  This definition does not provide a meaningful distinction between when a species is endangered or threatened in a SPOIR and when a species is imperiled throughout all its range, and will severely limit protection for species that are imperiled in significant portions of their ranges.  Indeed, this definition of significance has already formed the basis for denying protection to the cactus ferruginous pygmy-owl despite the fact that it is indisputably imperiled in the Sonoran Desert, which FWS itself determined is important to the representation, redundancy and resiliency of the species.[4]

Moreover, we believe this draft policy definition does not truly solve the redundancy problem identified by the Ninth Circuit Court of Appeals in Defenders of Wildlife v. Norton, 258 F.3d 1136 (9th Cir. 2001).  In Defenders, the appellate court held that "[i]f … the effect of extinction throughout 'a significant portion of its range' is the threat of extinction everywhere, then the threat of extinction throughout 'a significant portion of its range' is equivalent to the threat of extinction throughout *all* its range."  Id. at 1141.  Although worded differently, it seems that, in effect, the Services have again collapsed the two paths to species' protection mandated by Congress.  See 76 Fed. Reg. at 77,003 (conceding that, "[u]nder most circumstances, … the outcomes of [the agencies'] status determinations with or without the draft policy would be the same").

The draft policy emphasizes "the biological importance of the portion to the conservation of the species as the measure" for determining when a portion can be considered significant, using "the concepts of redundancy, resiliency, and representation."[5]  We support using these concepts to evaluate the significance of portions of range, but the threshold for determining this importance cannot be set as high as the risk of extinction to the species as a whole.  Instead, portions of range that meaningfully contribute to the species in terms of its redundancy, resiliency, and representation should be considered significant.  Please consider this alternative approach.

The draft policy further specifies that when considering whether a species is endangered in a SPOIR, the range that will be considered is "the general geographical area within which that species can be found at the time FWS or NMFS makes any particular status determination," and more directly that lost historical range "cannot constitute a significant portion of a species' range."[6]  Under this policy, past losses of species are effectively ignored unless they compromise the viability of the species in its current range, making determinations of the need to protect species arbitrarily dependent on when the agencies consider the status of a species.  This approach leads to a temporally shifting baseline, which has long been recognized as problematic by conservation scientists.[7]  We do not contend that lost historic range automatically means a

---

[3] 76 Fed. Reg. at 77,002.
[4] U.S. Fish and Wildlife Service, Endangered and Threatened Wildlife and Plants; 12-Month Finding on a Petition To List the Cactus Ferruginous Pygmy-Owl as Threatened or Endangered With Critical Habitat, October 5, 2011, 76 Federal Register 61856.
[5] 76 Fed. Reg. at 76,993.
[6] 76 Fed. Reg. at 77,002.
[7] See Dayton, P. K., M. J. Tegner, P. B. Edwards, and K. L. Riser.  1998.  Sliding baselines, ghosts, and reduced expectations in kelp forest communities.  Ecological Applications **8**:309–322; Waples, R. S., P. B. Adams, J. Bohnsack, and B. L. Taylor.  2008.  Legal viability, societal values, and SPOIR: response to D'Elia et al. Conservation Biology **22**:1075–1077; and Greenwald, D.N.  2009.  Effects on Species' Conservation of

species must be protected under the Endangered Species Act, but rather that, as with current range, the agencies should analyze whether areas of lost range are needed to ensure redundancy, resiliency, and representation of the species.

We are further concerned that the proposed SPOIR policy is inconsistent with the urgent need to ensure that species have sufficient habitat and adaptability to weather changes in their environment ongoing and predicted under climate change, which will undoubtedly have consequences on the range of imperiled species.  Therefore, it is essential that a SPOIR not be restrictive, but rather allow for broad protections to the full range of habitats occupied by species, some of which will undoubtedly provide climate refugia and thereby ensure their survival.

As acknowledged in the draft policy, protecting species because they are endangered in significant portions of their ranges "may lead to application of the protections of the Act in areas in which a species is not currently endangered or threatened with extinction."[8]  To address this issue while at the same time avoiding exposing more species to the risk of extinction, we agree with the Services that they have the discretion "to implement the Act, where possible, to avoid or minimize expending resources on actions that either do not address threats that led to the species warranting listing or do not advance recovery of the species."[9]


Sincerely,

Noah Greenwald
Endangered Species Program Director
Center for Biological Diversity

Leda Huta
Executive Director
Endangered Species Coalition

Patti Goldman
Vice President of Litigation
Earthjustice

Ralph Henry
Deputy Director, Animal Protection Litigation
The Humane Society of the United States

Corry Westbrook
Federal Policy Director
Oceana

---

Reinterpreting the Phrase "Significant Portion of its Range" in the U.S. Endangered Species Act.  Conservation Biology **23**:1374-1377.

[8] 76 Fed. Reg. at 76,992.

[9] Id.

Regina Asmutis-Silvia
Senior Biologist
Whale and Dolphin Conservation Society

Connie Hanson
Director
Christians Caring for Creation (CCC)

Sarina Jepsen
Endangered Species Program Director
The Xerces Society for Invertebrate Conservation
Sean Cosgrove

Sean Cosgrove
Ocean Campaign Director
Conservation Law Foundation

Linda Krop
Chief Counsel
Environmental Defense Center

Jeff Ruch
Executive Director
Public Employees for Environmental Responsibility (PEER)

Steve Pederey
Conservation Director
Oregon Wild

Duane Short
Wild Species Program Director
Biodiversity Conservation Alliance

Dave Werntz
Science and Conservation Director
Conservation Northwest

Cathy Liss
President
Animal Welfare Institute

Andrew J. Orahoske
Conservation Director
Environmental Protection Information Center

Ben Prater
Conservation Director
Wild South

Jon Marvel
Executive Director
Western Watersheds Project

Bruce McIntosh
Staff Ecologist
Western Nebraska Resources Council

Jennifer Schwartz
Staff Attorney
Hells Canyon Preservation Council

Mark Salvo
Wildlife Program Director
WildEarth Guardians

Paul Todd
Program Manager
International Fund for Animal Welfare

Tracy Coppola, J.D., M.S.
Program Associate
Born Free USA

Ben Schreiber
Climate and Energy Tax Analyst
Friends of the Earth

Chris Irwin
President
United Mountain Defense

Bill Matturro
Founder
Protect All Living Species

Cheryl Johncox
Executive Director
Buckeye Forest Council

Jim Scheff
Director
Kentucky Heartwood

Tim Keating
Executive Director
Rainforest Relief

Christine Ellis
Waccamaw RIVERKEEPER

Ernie Reed
Council Chair
Heartwood

David Orr
Protect Arkansas Wildlife

Patrick Moore
Legislative Director
Coastal Conservation League

Dan Silver
Executive Director
Endangered Habitats League

Scot Quaranda
Campaign Director
Dogwood Alliance

Kelly Burke
Executive Director
Grand Canyon Wildlands Council

D. Bruce Means
President and Executive Director
Coastal Plains Institute and Land Conservancy

Nancy Stranahan
Director
The Arc of Appalachia Preserve System

Steve Brooks
Director
The Clinch Coalition

Timothy J Coleman
Executive Director
Kettle Range Conservation Group

Melinda Hughes-Wert
President
Nature Abounds

Todd Steiner
Executive Director
Turtle Island Restoration Network

Mary Camp
President
Deer Creek Valley Natural Resources Conservation Association

Judith Rodd
Director
Friends of Blackwater

Mark Shelley
Director
Southern Appalachian Forest Coalition

Veronica Egan
Executive Director
Great Old Broads for Wilderness

Chad Hanson, Ph.D.
Director
John Muir Project

Jeff Petersen
Executive Director
Fund for Wild Nature

Ellen Rendulich
Director
Citizens Against Ruining the Environment

Dan Randolph
San Juan Citizens Alliance

Chris Matera, P.E.
Founder

Massachusetts Forest Watch
Sloan Shoemaker
Executive Director
Wilderness Workshop

Josh Pollack
Conservation Director
Rocky Mountain Wild

Bob Gale
Ecologist & Public Lands Director
Western North Carolina Alliance

Brent Plater
Executive Director
Wild Equity Institute

Jorge Andromidas
Director
Colorado Grizzly Project

Spencer Lennard
Director
Big Wildlife

Elizabeth Hurst-Waitz
Chapter President
Central New Mexico Audubon Society

Bob Sallinger
Conservation Director
Audubon Society of Portland

Josh Laughlin
Conservation Director
Cascadia Wildlands

Bethanie Walder
Executive Director
Wildlands CPR

Cynthia Sarthou
Executive Director
Gulf Restoration Network

Stan Kotala, M.D.
Conservation Chair
Juniata Valley Audubon

Gary Bobker
Program Director
The Bay Institute

Olivia Schmidt
Program Director
Bark

Michael J. Painter
Coordinator
Californians for Western Wilderness

Scott Greacen
Executive Director
Friends of the Eel River

Daniel Hall
Director, Market Solutions
ForestEthics

Brent Fenty
Executive Director
Oregon Natural Desert Association

Katie Tripp, Ph.D.
Director of Science and Conservation
Save the Manatee Club

Marydele Donnelly
Director of International Policy
Sea Turtle Conservancy

Kim McCreery, Ph.D.
Regional Director/Staff Scientist
New Mexico Wilderness Alliance

Tom Huhnerkoch
Director
Mountain Cats Trust

Matt Schwartz
Executive Director
South Florida Wildlands Association

Brooks Fahy
Executive Director
Predator Defense

Javier Biaggi
President
Sociedad Protectora de la Vida Silvestre de Puerto Rico

Wally Sykes
Co-Founder
NE Oregon Ecosystems

Catherine Eastman
Conservationist
Vilano Marine Turtle Patrol
Crescent Beach Turtle Patrol

Dave Holaway, President
White Mountain Conservation League

David Wade
Director
Endangered Small Animal Conservation Fund

Jennifer Bock
Water Director
High Country Citizens' Alliance

Camilla H. Fox
Executive Director
Project Coyote

Anja Heister
Footloose Montana

Elliott A. Norse, PhD
President
Marine Conservation Institute

Kevin Reuther
Legal Director
Minnesota Center for Environmental Advocacy

Maggie Howell
Managing Director
Wolf Conservation Center

Oscar Simpson
Chair
New Mexico Sportsmen

Beth Allgood Blalock
General Counsel
Georgia Conservancy

David R. Parsons
Carnivore Conservation Biologist
The Rewilding Institute